767 A.2d 996 (2001)
John Scott CAMPAGNA, an infant, by his Guardian Ad Litem and legal guardian Linda GRECO; and John Scott Campagna, individually; and Irene Edson, natural mother of John Scott Campagna, Plaintiffs-Appellants,
v.
AMERICAN CYANAMID COMPANY, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued January 16, 2001.
Decided March 5, 2001.
*997 Stanley P. Kops (Kops & Fenner), Philadelphia, of the Pennsylvania bar, admitted pro hac vice, argued the cause for appellants (Kreindler & Kreindler and Paul Speziale, attorneys; Marc S. Moller, Henry Gluckstern, Mr. Speziale, and Mr. Kops, on the brief).
Roger W. Yoerges (Wilmer, Cutler & Pickering) of the District of Columbia bar, admitted pro hac vice, argued the cause for respondent (Porzio, Bromberg & Newman and Wilmer, Cutler & Pickering, attorneys; Lauren E. Handler, David P. Donovan, Mr. Yoerges, Lara A. Englund, and Rachael D. Kent, on the brief).
Before Judges PETRELLA, BRAITHWAITE and WELLS.
The opinion of the court was delivered by BRAITHWAITE, J.A.D.

I. Introduction
Plaintiff John Scott Campagna ("John") was born on June 27, 1979. On December 8, 1979, John's mother, plaintiff Irene Edson, took him to the office of Dr. Charlotorn Locharernkul, who vaccinated John against polio by giving him Orimune OPV, an oral polio vaccine, manufactured by defendant American Cyanamid Company. Shortly thereafter, John was hospitalized with a high fever and a paralyzed left leg. He was discharged from the hospital with a diagnosis of "poliomyelitus, meningoencephalitis and left leg paralysis." In 1994, John, through his guardian ad litem and legal guardian Linda Greco, and his mother commenced this products' liability action against defendant seeking damages, alleging that the vaccine was defective because it did not comply with federal regulations and asserting that defendant failed to adequately warn of the dangers presented by the non-compliant vaccine.
Defendant filed an answer denying the material allegations of the complaint and asserting affirmative defenses. Following discovery, defendant moved for summary judgment, contending that there were deficiencies in plaintiffs' proofs and that there was a lack of proof "that any regulatory violation was a proximate cause of [John's] injuries." With respect to plaintiffs' failure-to-warn claim, defendant asserted that plaintiffs' proofs were deficient and that plaintiffs could not prove that an "allegedly inadequate warning was a proximate cause of [John's doctor's] decision to administer" the Orimune OPV to John. For purposes *998 of the motion, defendant assumed that John's injuries were the result of poliomyelitus.
Plaintiffs opposed defendant's motion. Plaintiffs also cross-moved, seeking summary judgment on their failure-to-warn claim. The motions were argued on October 21, 1998. The motion judge denied defendant's motion, concluding that plaintiffs had raised genuine issues of material fact. The judge also denied plaintiffs' cross-motion, determining that the motion had not been properly filed and that defendant did not have "appropriate time within which to prepare a response or prepare for oral argument."
Thereafter, on March 18, 1999, defendant moved for reconsideration. At the time, the original motion judge was unavailable due to maternity leave. The motion was carried until the judge's return. The reconsideration motion was heard on June 30, 1999. During the motion for reconsideration, defendant told the judge that, for the purposes of that motion, she could "assume that every dose of vaccine ever manufactured was administered to John Campagna with respect to the legal issue we are raising now and that is whether the existence of one or two grade 3-3 monkeys has correlated any increased risk of vaccine-associated polio."
The motion judge granted defendant's motion for reconsideration. On the defective-product claim, the judge determined that, even if she found that the vaccine administered to plaintiff "did not satisfy the [FDA's] regulatory standard," plaintiffs would still have to prove proximate cause. According to the judge, plaintiffs had "not presented proof that any of the regulatory violations that they alleged [had occurred] had any effect on the safety of defendant's vaccine or on its propensity to cause vaccine-associated polio." Expanding on that point, the judge found that plaintiffs had not presented proof that "the alleged non-compliance [with Food and Drug Administration vaccine-manufacturing regulations] made the subject vaccine in question any less safe ... [than] the vaccine produced in compliance with the federal mandate." Thus, the judge concluded that plaintiffs had failed to provide proof of proximate causation to support their product-defect claim.
As to plaintiffs' failure-to-warn claim, the judge concluded that plaintiffs had failed to overcome the rebuttable presumption contained in N.J.S.A. 2A:58C-4, that a warning or instruction is adequate if approved by the Food and Drug Administration "FDA"). Further, the motion judge held that even if she found that defendant's warning on the package insert was inadequate, and that defendant had thus breached its duty to warn John's physician, plaintiffs would still have the burden of proving proximate cause. The judge ruled that plaintiffs had failed to submit proof "that a different warning would have altered John's doctor's decision to administer [the oral vaccine] to plaintiff."
Plaintiffs now appeal and, although they raise a number of points, essentially assert that the motion judge erred in granting summary judgment to defendant. We agree that the motion judge erred in concluding that plaintiffs failed to establish proximate cause in both their product-defect and failure-to-warn claims. We also conclude that the motion judge erred in ruling that plaintiffs failed to rebut the statutory presumption of N.J.S.A. 2C:58C-8. We, therefore, reverse the summary judgment granted to defendant and remand for further proceedings. We also reject plaintiffs' contention that we grant judgment to them on their failure-to-warn claim.

II. Historical and Technical Background of Polio Vaccination
Poliomyelitus, more commonly known as "polio," is a disease of the central nervous system that manifests itself in three forms or types. Type 1 polio can only be caused by a Type 1 polio virus; Type 2, only by a Type 2 polio virus; and Type 3, only by a *999 Type 3 polio virus. In re Sabin Oral Polio Vaccine Prods. Liab. Litigation, 763 F.Supp. 811, 814 (D.Md.1991), aff'd, 984 F.2d 124 (4th Cir.1993).[1]
In 1955, Dr. Jonas Salk developed a vaccine that protected against all three types of poliovirus. Sabin II, supra, 763 F.Supp. at 814. To induce immunity, Salk's vaccine utilized poliovirus that had been killed or "inactivated" and thus was referred to as an "inactivated polio vaccine" or "IPV". Ibid. While the Salk vaccine substantially decreased the incidence of polio infection, it did not eliminate the disease. Ibid. In the late 1950s, thousands of persons in the United States continued to contract the disease. Ibid.
In response to this continuing problem, the Surgeon General of the United States formed a committee in 1958 to determine the feasibility of developing an oral polio vaccine or "OPV". Ibid. An OPV has advantages over an IPV in that it is less costly and can be administered orally, rather than through a series of shots and booster shots.
An OPV has an inherent risk, however. To induce immunity, an OPV utilizes attenuated or weakened poliovirus to mildly infect the person vaccinated. Ibid. The use of such living, though weakened, viruses to stimulate immunity, carries with it the risk that the person vaccinated or a person in close contact with the person vaccinated may develop a polio infection. Ibid.
Pursuant to federal law, a vaccine manufacturer must obtain a product license prior to marketing its particular brand of OPV. Berkovitz v. United States, 486 U.S. 531, 540, 108 S.Ct. 1954, 1961, 100 L.Ed.2d 531, 543 (1988). In order to become eligible for such a license, the manufacturer must first make a sample of the vaccine for testing and for submission to the Division of Biological Standards ("DBS").[2]Ibid.; 21 C.F.R. §§ 601.2, 601.4 (1992). Since 1979, defendant has been the only licensed manufacturer of OPV in the United States.
There are three phases to the production of an OPV. Sabin I, supra, 743 F.Supp. at 413. First, a "strain" of a type of attenuated poliovirus is obtained by passage of the wild type of that virus through an animal host. Ibid. A portion of the resulting strain is then inoculated into monkey kidney cell cultures, thus producing a "seed" of the particular type of virus. Ibid. "Pools" of vaccine are then made from this seed type, and separate production "lots" of that type of vaccine are derived from these pools. Ibid.; Berkovitz, supra, 486 U.S. at 541, 108 S.Ct. at 1961, 100 L.Ed.2d at 543.
At this stage of production, vaccine pools contain only one of the three types of OPV (Type 1 vaccine, Type 2 vaccine, or Type 3 vaccine) and are referred to as "monovalent" pools or "monopools." Sabin I, supra, 743 F.Supp. at 413 n. 4. To obtain a dose of vaccine that immunizes against all three types of polio, separate lots of Type 1, Type 2, and Type 3 vaccine are commingled to produce a single "trivalent" pool from which a trivalent vaccine may be derived. Ibid.
*1000 Defendant's OPV, Orimune OPV, is a trivalent vaccine that provides immunity against all three types of polio. Significantly, from 1965 to 1983, a period that included the time of plaintiff's OPV vaccination in 1979, Orimune's Type 3 vaccine component was derived from Seed 45 B 85. This is the same seed that was implicated in the Sabin and Berkovitz cases. Sabin II, supra, 763 F.Supp. at 821; Sabin I, supra, 743 F.Supp. at 413 n. 6.
In order to qualify for licensure, an OPV, like defendant's Orimune OPV, had to pass a monkey neurovirulence test. 21 C.F.R. §§ 601.4, 610.1, 630.17 (1992); Berkovitz, supra, 486 U.S. at 546, 108 S.Ct. at 1963, 100 L.Ed.2d at 546; Sabin II, supra, 763 F.Supp. at 815. "Neurovirulence is the capacity of an infectious agent to produce pathologic effects on the central nervous system." Berkovitz, supra, 486 U.S. at 545 n. 9, 108 S.Ct. at 1962 n. 9, 100 L.Ed.2d at 545 n. 9.
The monkey neurovirulence test requires that a specific number of monkeys be injected with varying concentrations of vaccine from the monopool to be tested. Sabin II, supra, 763 F.Supp. at 815. Some of the monkeys receive the injection intrathalamically at the stem of the brain, while others are injected at the base of the spine. Ibid. The monkeys are kept under observation for a set period and then destroyed so that a pathological examination can be performed on tissue taken from their brains, spinal cords, and lumbar spines to study the effect of the injected test material. Ibid.
The test results from the monkeys are then arrayed as number scores of "0," where no polio lesions are observed in a monkey's tissues, to "4," where severe lesions are present. Id. at 815-16. Two scores are provided for each monkey, reflecting the presence or absence of lesions at the point of injection (the "severity" score), and the presence or absence of lesions at the relevant point most distant from the point of injection (the "spread" score). Id. at 816. Thus, for a monkey injected intrathalamically, the tissue taken from its brain stem provides the severity score, while the tissue taken from its lumbar spine provides the spread score. Ibid. Each monkey is then assigned a single-number, "final neurovirulence grade" which is the higher of the severity or spread scores that it received. Ibid.
The test results for a particular vaccine monopool are then compared to the results obtained from monkeys similarly injected with a reference virus. Id. at 815. Because Type 1 vaccine had proved to be the safest in clinical field trials, it was selected as the reference virus for all three types of OPV to be tested. Ibid. A product license could only be issued if the tested vaccine monopool proved to be no more neurovirulent than the reference virus. Ibid.; 21 C.F.R. §§ 601.4, 630.17 (1992). However, problems soon arose because the Type 3 vaccine pools proved to be "hotter" than the Type 1 reference virus. That is, the Type 3 vaccines were more neurovirulent than the controlling regulatory reference standard. Sabin II, supra, 763 F.Supp. at 820.

III. Defendant's License
During defendant's licensure tests for Orimune OPV in 1961, one monkey obtained a test score of 4 while being tested with a Type 3 vaccine monopool. Id. at 816. Defendant had never had a grade 3 or 4 monkey during its tests utilizing the Type 1 reference virus. Ibid. DBS conducted its own test of defendant's Type 3 vaccine and the result was two grade 4 monkeys. Ibid. While DBS had a grade 3 monkey on its prior tests of the reference virus, it had never had a grade 4 monkey. Ibid.
In a second round of tests, defendant experienced a grade 3 monkey and DBS experienced a grade 4 monkey. Ibid. Defendant and DBS exchanged some monkeys and, in a third round of tests, defendant experienced two grade 3 monkeys and DBS experienced three grade 3 monkeys. Ibid. Despite these test results, *1001 the Surgeon General's committee met and concluded that defendant's Type 3 vaccine had met the requirements for licensure. Id. at 817.
Following licensure, DBS was concerned because the production lots for the Type 3 component of defendant's Orimune OPV were still proving to be more neurovirulent than the Type 1 reference standard. Ibid. DBS recognized that a logical solution to the problem would be to amend the regulations to change the reference standard for testing the Type 3 vaccine monopool component to a Type 3 vaccine. Ibid. DBS elected not to seek an amendment, however, because of concerns about the interruption of the vaccine supply, as well as a recognition that "a proposed amendment changing the reference standard might erode public confidence in the OPV program and deter parents from having their children vaccinated." Id. at 817-18.
Subsequently, DBS developed, but apparently did not implement, new methods for testing and releasing lots of Type 3 vaccine. Sabin II, supra, 763 F.Supp. at 818-21. If those methods had been applied, many more lots of Type 3 vaccine would have failed the neurovirulence test than were then currently failing. Ibid. DBS finally concluded that it was necessary to amend the regulations to provide a Type 3 reference virus against which to test Type 3 vaccine monopools. Id. at 820-21. This amendment was not accomplished, however, until 1991. 21 C.F.R. § 630.16 (1992).
In the meantime, the DBS continued to approve the release of Type 3 vaccine by defendant and other manufacturers without strict adherence to the regulatory prohibition concerning the Type 1 reference standard. Sabin II, supra, 763 F.Supp. at 818-21. As set out in relevant part in defendant's interoffice memorandum dated December 27, 1977:
[DBS] asked [defendant] to bear with them in their efforts to change regulations which may be accomplished by mid 1978. In [the] interim we are advised to release our [vaccine lot] protocols as we have been i.e.: avoid critical review of intra-spinal results; consider grade 3 lesion on Type 3 test as acceptable on intra-thalamic test. Where we have a question [defendant] will call [DBS] before signing and releasing a neurovirulence protocol. [DBS] stated that during this period [DBS] and [defendant] must continue with guidelines that may be technically outside the regulations as written but we must do this if we are to continue to offer vaccine.

[Sabin II, supra, 763 F.Supp. at 820-21 (alteration in original removed).]
As a result of DBS' actions, the Sabin II court determined that the United States, through DBS, "violated the regulations by releasing vaccine lots which exceeded the reference vaccine in neurovirulence." 763 F.Supp. at 829. Here, however, the allegation is that defendant released vaccine that did not comply with regulations concerning neurovirulence. As a vaccine manufacturer, defendant was under an obligation at the time of plaintiff's vaccination in 1979, "to examine all vaccine lots prior to distribution to ensure that they comply with regulatory standards." See 21 CFR § 610.1 (1978). Berkovitz, supra, 486 U.S. at 546, 108 S.Ct. at 1963, 100 L.Ed.2d at 546.

IV. Discussion
As noted, John was born on June 27, 1979, and was administered oral polio vaccine on December 8, 1979. The Orimune OPV vaccine that defendant provided to John's doctor included one of two possible package inserts, both of which warned against the remote danger that the OPV could cause polio to vaccine recipients. Significantly, the package inserts also stated in pertinent part that Orimune OPV "has been produced and tested in accordance with the regulations of the United States Food and Drug Administration for the production of Poliovirus Vaccine, Live, Oral, Trivalent."
*1002 John's mother testified during her deposition that she did not remember what, if anything, the doctor told her about the OPV that he administered to John on that day. By the time defendant's summary judgment motion was decided, the doctor had left the United States for Thailand and evidently was unavailable to testify concerning matters in this case.
Because this case arises from the grant of motion for summary judgment, "we must view the facts that may be inferred from the pleadings and discovery in the light most favorable to plaintiffs." Strawn v. Canuso, 140 N.J. 43, 48, 657 A.2d 420 (1995). Viewed under that standard, the issue here is whether plaintiffs have presented sufficient evidence to create a genuine issue of fact regarding proximate cause of John's injuries, with respect to both his product-defect and failure-to-warn claims.
In dismissing plaintiffs' product-defect claim, the judge focused on the issue of proximate causation. The judge opined that, even if she assumed "that the dose [of Orimune OPV] that Plaintiff was administered did not satisfy the regulatory standard," and:
despite the opposition submitted by Plaintiff being viewed in its most favorable light, there is no evidence and/or expert to show that the subject vaccine was any less safe than the vaccine produced in compliance with the federal regulations. The Plaintiff has not brought forth any fact wherein a jury could find proximate causation as to the regulatory violations alleged by Plaintiff and the vaccine pools available in 1979. Plaintiff has not presented proof that any of the regulatory violations that they alleged had any effect on the safety of Plaintiff's vaccine or on its propensity to cause vaccine associated polio.... Moreover, no study, publication or medical literature is found to show that the vaccine or pool of vaccine in question was any less safe than the vaccine produced in strict compliance with the federal regulations at the time the vaccine was administered to Plaintiff....
Therefore, I conclude that Plaintiff has failed to present any evidence from which a jury could reasonably find ... that the alleged non-compliance [with the federal neurovirulence regulations by defendant] made the subject vaccine in question any less safe [than] the vaccine produced in compliance with the federal mandate.
The judge based the dismissal of plaintiffs' product-defect claim on the absence of proof that a non-compliant vaccine was any more dangerous to a vaccine recipient, like John, than a compliant vaccine. Defendant argued that the deposition testimony of plaintiffs' experts acknowledged that there were no published medical studies which quantified or measured any degree of additional risk of polio infection presented by a non-compliant vaccine as compared to a compliant vaccine.
Essentially, the judge reasoned that, unless plaintiffs could prove that non-compliant vaccines were measurably more dangerous than vaccines that complied with the federal regulations, plaintiffs could not prove that John's vaccination with Orimune OPV was a proximate cause of his injuries. In contrast, plaintiffs contended that, though there are no scientific studies that quantify the degree of additional risk, excessive monkey neurovirulence test scores are a "prognosticator of paralytic poliomyelitis" when the tested vaccine is later administered to humans. Applying the standard that the facts must be viewed in the light most favorable to plaintiffs, we agree.
The problem with the motion judge's decision, is that it does not view favorably the medical and scientific determination implicit in the federal regulations which existed at the time that John received his vaccination. This problem was addressed by the Sabin III court.
In Sabin III, supra, the district court tried two of the seven cases involved in the *1003 Sabin multidistrict litigation, deciding issues of duty, breach of duty, and causation under applicable state law and awarding stipulated damages. 774 F.Supp. at 953-58. Significantly, the Sabin III court recognized that the monkey neurovirulence test had been "established in the regulations as a means for defining acceptable risk" when releasing vaccine lots for administration to the public. Id. at 957.
Commenting on an issue closely akin to the one here, the Sabin III court indicated that:
[a]lthough there is no necessary or definitive correlation between the results of monkey neurovirulence tests and a vaccine's neurovirulence when administered to humans, monkey neurovirulence testing provides as precise a measure for determining neurovirulence in humans as can reasonably be devised. The law can do no more than adopt the best available scientific standard, and therefore it must be concluded that by releasing vaccine lots whose monkey neurovirulence test results exceeded the regulatory criteria, DBS increased the risk of harm to persons who were vaccinated....

[Id. at 955.]
Thus, the Sabin III court accepted the determination of the efficacy of the neurovirulence test that was implicit in the federal regulations, even though that determination did not rest upon measurable or quantifiable scientific results showing an increase in the degree of risk of polio infection in humans when neurovirulence test scores exceeded the vaccine reference standard.
Similarly, in Griffin v. United States, 351 F.Supp. 10 (E.D.Pa.1972), aff'd, in relevant part, 500 F.2d 1059 (3d Cir.1974), the district court was confronted with the federal government's contention that "evidence of monkey neurovirulence cannot be extrapolated to expectations of virulence in man." 351 F.Supp. at 21. The Griffin court disagreed, stating that the "relevant data seem to indicate the opposite conclusion, at least on a gross scale." Ibid. After reviewing this data, the Griffin court opined that "[i]t seems that monkey neurovirulence does have some relation to the risk in man." Id. at 22.
We are satisfied that the monkey neurovirulence test has been accepted as a predictor of a vaccine lot's neurovirulence in humans, even though the extant medical and scientific data does not quantify the increased degree of risk presented by vaccine lots with excessive test scores. This judicial acceptance mirrors the medical and scientific acceptance of the test by the DBS from the earliest stages of its OPV program in the United States.
Plaintiffs presented evidence that, at the time plaintiff received his polio vaccination, at least two of the seven Type 3 monopools which may have been used to produce that vaccine were defective because they included monkeys whose neurovirulence grades should have caused those monopools to fail the neurovirulence tests. For purposes of deciding its summary judgment motion, defendant indicated that the court "can assume that every dose of vaccine ever manufactured [by defendant] was administered" to plaintiff. Thus, in deciding defendant's motion, the judge effectively assumed as fact that plaintiff received a monopool of defendant's Type 3 vaccine that failed to satisfy the regulatory requirements of the monkey neurovirulence tests. Viewed in the light most favorable to plaintiffs, we conclude that this evidence was sufficient to create a genuine issue of material fact as to defeat defendant's motion for summary judgment on plaintiffs' product-defect claim.
As to plaintiffs' failure-to-warn claim, they contend that the motion judge erred in determining that there was no proof that the warnings provided by defendant in the package inserts were inadequate. In dismissing plaintiffs' failure-to-warn claim, the motion judge correctly noted that N.J.S.A. 2A:58C-4 provides the framework for a manufacturer's duty to *1004 warn. N.J.S.A. 2A:58C-4 provides, in pertinent part, that:
[i]n any product liability action the manufacturer or seller shall not be liable for harm caused by a failure to warn if the product contains an adequate warning or instruction.... An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the product, taking into account ... in the case of prescription drugs ... the characteristics of, and the ordinary knowledge common to, the prescribing physician. If the warning or instruction given in connection with a drug ... has been approved or prescribed by the federal Food and Drug Administration ... a rebuttable presumption shall arise that the warning or instruction is adequate....
Defendant's evidence demonstrated that the Type 3 vaccine lots which may have been administered to John, as well as the two Orimune OPV package inserts that may have been included with the vaccine administered to John in 1979, had been reviewed and approved by the FDA. Relying on that evidence and N.J.S.A. 2A:58C-4, the motion judge determined that defendant raised a rebuttable presumption that it had provided an adequate warning concerning the Orimune OPV. The judge concluded that the:
record is absent as to any proof that the warning or instruction given to the doctor or by the doctor to ... [John's] mother was inadequate. This Court finds that Plaintiff has not rebutted the statutory exception [contained in N.J.S.A. 2C:58C-4] of the manufacturer's duty to warn. Of important note is the fact that no expert testimony or opinion has been offered by the Plaintiff which has persuaded this Court otherwise.
On appeal, plaintiffs chiefly rely upon three unsworn reports from their medical experts to show that there was proof before the trial court on the issue of the warning's inadequacy. However, because those reports were not deposition testimony and did not constitute affidavits, they were not "competent evidential materials" for the purpose of opposing defendant's motion for summary judgment. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995); R. 4:46-2(c).
However, a careful review of the record reveals that inferences from other evidential materials fulfilled that purpose. When pieced together, materials indicate that the motion judge erred in determining that plaintiffs did not present proof to rebut the statutory presumption that defendant's disputed warning was adequate.
In the Sabin litigation, it was determined both that the DBS/FDA "violated two regulations governing the manufacture and release of oral polio vaccine" and that the non-compliant vaccine released as a result of those violations proximately caused injuries to two plaintiffs. Sabin IV, supra, 984 F.2d at 125, 127-28. Plaintiffs presented expert deposition testimony indicating that, like the DBS/FDA in the Sabin litigation, defendant similarly violated at least one comparable vaccine-safety regulation by releasing non-compliant Type 3 vaccine lots during 1979, which was around the time that plaintiff received his vaccination.
Accordingly, at the time the court decided defendant's summary judgment motion, it had before it evidential materials indicating that defendant had released vaccine lots that violated federal safety regulations and which may have been used to vaccinate plaintiff. At a minimum, defendant's violation of the vaccine-safety regulations could have been viewed by the court as evidence of defendant's liability under these circumstances. See Alloway v. Bradlees, Inc., 157 N.J. 221, 236, 723 A.2d 960 (1999) (discussing the violation of *1005 OSHA regulations and commenting on the "well-established principle that the violation of a legislated standard of conduct may be regarded as evidence of negligence if the plaintiff was a member of the class for whose benefit the standard was established").
The disputed package insert states as part of its warning that defendant's "vaccine has been produced and tested in accordance with the regulations of the United States Food and Drug Administration for the production of Poliovirus Vaccine, Live, Oral, Trivalent." Plaintiffs essentially argue that this statement is false and that the warning is inadequate because it fails to inform physicians administering Orimune OPV that the vaccine was not produced and tested in accordance with relevant federal regulations. At the time of summary judgment, the language of the insert was at odds with the result in the Sabin litigation and the deposition testimony of plaintiffs' experts. What was missing was evidence that a package insert's warning language is inadequate where it incorrectly specifies that a vaccine complies with all federal regulatory requirements.
Plaintiffs submitted deposition testimony from another vaccine case in opposition to defendant's motion for summary judgment on their failure-to-warn claim. The testimony was from Stephen A. Szumski, Ph.D., who was employed by defendant as the Associate Director of the Professional Medical Service Department from 1965 to 1982, in which capacity he evidently chaired a committee that reviewed and approved defendant's package inserts for its drug products, including Orimune OPV.
On direct examination by the plaintiff's attorney during the deposition, Dr. Szumski was asked if he was aware that defendant and the DBS had released vaccine lots which did not comply with the controlling federal safety regulations, would he have "told the medical profession about it?" He replied that he "would discuss it with them, certainly."
Dr. Szumski was asked if had he been given a report that defendant prepared listing the numerous vaccine pools which would have failed if defendant had complied fully with the regulations, would he have "told the physicians about that danger?" Dr. Szumski jousted with the plaintiff's attorney, who finally asked, "Would you tell him [the physician], there's a danger here, sir, but here's what we know?" Dr. Szumski replied, "That's probably what I would have told them."
Dr. Szumski was also asked if he was aware that defendant's vaccine had failed certain safety tests (tests that were required under the federal regulations), would he have "notified the medical profession" if the medical profession had asked whether the vaccine could be administered? Dr. Szumski answered, "Well, I certainly would have told them not to use it."
The plaintiff's attorney then read to Dr. Szumski the disputed warning statement concerning regulatory compliance from the package insert and Dr. Szumski testified that he thought physicians would believe that statement. When asked if the statement would constitute a "misrepresentation" or "lie" if defendant had released vaccine that did not comply with the regulations, Dr. Szumski replied, "Well, if they [defendant] say so and it wasn't so, then certainly I would believe it's a lie."
On cross-examination by defendant's attorney, Dr. Szumski was asked "[i]f it was determined by the [FDA] that a technical violation of the regulations had no effect on the safety of the [Orimune OPV] vaccine, do you think it would be reasonable for [defendant] to rely on that?" Dr. Szumski answered, "Yes, [defendant] would take action and they probably wouldn't market it." Unsatisfied with this answer, defendant's attorney repeated the question and Dr. Szumski again replied: "[Defendant] would probably act on it [the FDA's determination] and not use the vaccine." Still unsatisfied, defendant's attorney *1006 repeated the question again, whereupon Dr. Szumski answered that defendant "would use their judgment" in relying on the FDA's determination.
Finally, on redirect examination by the plaintiff's attorney, Dr. Szumski was asked, "Doctor, if in 1978 [Orimune OPV] did not technically comply with the regulations, if you were aware of that in 1978, would you have informed physicians, hospitals, and other health care providers of that fact?" Defendant's attorney objected, and the plaintiff's attorney rephrased the question, asking "If it [Orimune OPV] did not technically comply with the regulations in 1978, would you have informed health care providers of that fact?" Dr. Szumski replied that, "[i]f it didn't comply with the regulations, it wouldn't have been on the market."
The inference to be drawn from Dr. Szumski's quoted deposition testimony for summary judgment purposes, is that a vaccine that has been produced and released by a manufacturer without strict adherence to federal safety regulations, should not be marketed and administered to patients. Significantly, Dr. Szumski indicated that the medical profession should be informed by the manufacturer about the vaccine's noncompliance with those regulations. Moreover, Dr. Szumski indicated that, if a manufacturer intentionally claimed that a vaccine was produced in compliance with federal regulations and it was not, then the manufacturer's claim would be a "lie."
An "adequate" warning concerning a vaccine, like defendant's Orimune OPV, is "one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the product, taking into account ... the characteristics of, and the ordinary knowledge common to, the prescribing physician." N.J.S.A. 2A:58C-4.
Implicit within Dr. Szumski's deposition testimony is the proposition that an "adequate" warning to the medical profession concerning defendant's Orimune OPV would have informed the physicians that the vaccine did not comply with federal safety regulations governing production and testing. An inference could be drawn from Dr. Szumski's testimony that such information was necessary to fully communicate to the medical profession the possible danger presented by a non-compliant vaccine. Thus, Dr. Szumski's testimony, for summary judgment purposes, amounted to evidence that the warning statement on defendant's package insert was inadequate under N.J.S.A. 2A:58C-4 because it incorrectly specified that Orimune OPV was produced in compliance with all federal regulatory requirements.
Viewed in this light, the result is that there was sufficient evidence before the motion judge to rebut the statutory presumption that defendant's warning on its package insert was adequate. Dr. Szumski's position with defendant, as a key manager responsible for approving the content of package inserts, serves to lend enhanced credibility to his deposition testimony on the subject of the adequacy of the inserts' warning language. We conclude that plaintiffs presented competent evidential materials, when viewed in the light most favorable to them, that rebutted the statutory presumption. Brill, supra, 142 N.J. at 540, 666 A.2d 146.
The motion judge also dismissed plaintiffs' failure-to-warn claim on proximate cause grounds. She found that plaintiffs presented no proofs that a different statement concerning regulatory compliance would have affected the doctor's decision to administer Orimune OPV. The judge relied on Judge Skillman's dissenting opinion in Strumph v. Schering Corp., 256 N.J.Super. 309, 323-28, 606 A.2d 1140 (App.Div.1992), rev'd on dissent, 133 N.J. 33, 626 A.2d 1090 (1993).
In Strumph, the plaintiff alleged that she had been injured following her ingestion *1007 of the defendant's drug and that her injuries were the result of an inadequate warning concerning that drug. 256 N.J.Super. at 310, 606 A.2d 1140. Significantly, the plaintiff's physicians did not rely upon the disputed warning. Id. at 323-24, 606 A.2d 1140. The trial judge granted summary judgment for the defendant, reasoning that the physicians' express non-reliance on the disputed warning meant "that plaintiff would be unable to establish that defendant's warning, if found to be inadequate, was a proximate cause of her condition." Id. at 315, 606 A.2d 1140. A majority of the panel reversed, reasoning that other evidence in the case created a triable issue of fact. Id. at 319-23, 606 A.2d 1140.
In his dissenting opinion that was later adopted by our Supreme Court, Judge Skillman reasoned that:
[p]laintiff has the burden of proving that defendant's alleged warnings were a proximate cause of her injuries. To satisfy this burden, plaintiff must show that adequate warnings would have altered her doctors' decision to prescribe [the drug] Trilafon. Absent any evidence from which a jury could reasonably make this finding, defendant was entitled to summary judgment.

[Id. at 323, 606 A.2d 1140 (citations omitted).]
Here, based on the above-quoted language, the motion judge dismissed plaintiffs' failure-to-warn claim, determining that, "since [John's doctor] cannot be located, [p]laintiff has presented no proof that a different warning would have made any difference in [the doctor's] decision to administer [Orimune OPV] to [John]."
We conclude that the deposition testimony of Dr. Szumski is sufficient to defeat defendant's motion for summary judgment in this regard. At his deposition, Dr. Szumski was questioned on the topic of defendant's alleged regulatory violations and pointedly asked on direct examination, "And you know that no physician would administer this [Orimune OPV] vaccine if they knew it was [manufactured] outside the regulations; isn't that correct, sir?" Dr. Szumski answered, "Well, that would probably be what they would do."
Thus, there was evidence before the motion judge from a responsible, managerial-level employee of defendant indicating that a physician would not administer a vaccine to a patient if the physician was first made aware that the vaccine's manufacturer had not adhered to the relevant safety regulations in producing the vaccine. Accordingly, an inference may be drawn that had John's doctor been advised by the package insert that Orimune OPV was not produced in strict adherence to the federal safety regulations, he would not have administered the vaccine to John. This is sufficient to defeat summary judgment.
Finally, we reject plaintiffs' assertion, contained only in the conclusion section of their brief, that we direct the trial court to enter judgment for plaintiffs "that defendant failed to warn and that Orimune OPV was a defective product as a matter of law." In making this request, plaintiffs are essentially appealing from the motion judge's denial of their cross-motion for summary judgment. The judge denied plaintiffs' cross-motion because she "determined that this motion was not properly filed by movant [plaintiffs] and Defendant did not have appropriate time within which to prepare a response or prepare for oral argument"
On appeal, plaintiffs did not indicate in either their notice of appeal or in their amended notice of appeal that they were appealing from the order of March 4, 1999, that denied their cross-motion. The comment to the relevant court rule states that "it is clear that it is only the judgments or orders or parts thereof designated in the notice of appeal which are subject to the appeal process and review." See Sikes v. Township of Rockaway, 269 N.J.Super. 463, 465-466, 635 A.2d 1004 (App.Div.), aff'd o.b. 138 N.J. 41, 648 A.2d 482 (1994); *1008 Pressler, Current N.J. Court Rules, comment 6 on R. 2:5-1(f)(3)(i) (2001). This issue is not properly before us for review.
Reversed and remanded.
NOTES
[1] There are various Sabin cases relevant to this appeal. To promote clarity, we shall refer at length to the courts' opinions in In re Sabin Oral Polio Vaccine Prods. Liab. Litigation, 743 F.Supp. 410 (D.Md.1990) ("Sabin I," hereafter); 763 F.Supp. 811 (D.Md.1991) ("Sabin II," hereafter); 774 F.Supp. 952 (D.Md.1991) ("Sabin III," hereafter); and 984 F.2d 124 (4th Cir.1993) ("Sabin IV," hereafter), all of which specifically address this same factual background in deciding very similar issues concerning defendant's oral polio vaccine.
[2] In 1982, the DBS was transferred from the National Institutes of Health to the FDA, where it was renamed the Bureau of Biologics. Sabin II, supra, 763 F.Supp. at 813 n. 1. In 1984, the Bureau of Biologics was renamed the Office of Biologics Research and Reviews. Ibid. For clarity, we will use "DBS" to refer to these three embodiments of this single federal agency.