# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2148-21

L.P.,

    Plaintiff-Respondent,

v.

S.C.,

    Defendant-Appellant.

_____

Argued October 23, 2023 – Decided December 11, 2023

Before Judges Marczyk and Vinci.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FV-13-1042-22.

Alfred Michael Caso argued the cause for appellant (Ansell Grimm & Aaron, P.C., attorneys; Alfred Michael Caso, of counsel and on the briefs).

Timothy F. McGoughran argued the cause for respondent (Law Office of Timothy F. McGoughran LLC, attorneys; Timothy F. McGoughran and Yessenia Gonzalez, on the brief).

PER CURIAM

Defendant S.C.[1] appeals from the February 4, 2022 final restraining order ("FRO") entered against him and in favor of plaintiff L.P. pursuant to the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35 ("PDVA").[2] Following our review of the record and applicable legal principles, we affirm.

I.

Plaintiff and defendant met at a gym and engaged in a five-year non-continuous extramarital affair. In January 2022, plaintiff filed a domestic violence complaint alleging harassment and was granted a temporary restraining order ("TRO"). Defendant subsequently filed a domestic violence complaint against plaintiff, also alleging harassment, and obtained a TRO. Both parties appeared pro se at the virtual trial in February 2022.

Plaintiff explained her relationship with defendant deteriorated in the summer of 2020. She testified:

> I believed . . . everything kind of snapped the [s]ummer before. I went to rehab. I was not talking to [defendant] when I went to rehab. A friend told [defendant] that I went to rehab and [defendant] was so offended that I did[ not] reach out to him . . . . So he took that very

---

[1] We utilize initials to protect the confidentiality of the parties. R. 1:38-3(d)(9).

[2] Defendant's request for an FRO was denied. Defendant does not appeal from that order, and we confine our discussion to the facts surrounding plaintiff's FRO.

personally. This [past] [s]ummer I started going to AA and . . . he just flipped on me because I made time for AA but I did[ not] make time for him. And . . . he harassed my sponsor. I have the text -- I have the evidence I submitted he sent to her a bottle of [alcohol] from me. He was harassing her online. He harassed other members of AA. He was saying he was going to come to the meetings and Facebook Live it.

So that was the start of just harassment like I[ have] never experienced. And we were good friends besides everything else. So I just never saw this coming from [defendant].

At one point, the parties reconciled and made plans to see each other. However, plaintiff did not wish to go through with the plans and canceled, which angered defendant. Plaintiff explained:

So, eventually, somehow we managed to smooth things out. We made plans to hang out. I did[ not] really want to hang out. And when I told [defendant] the next day that I was[ not] going to hang out he just attacked me like I just never saw coming. I -- included on the text, "I won't leave you alone until you kill yourself." On and on. He threatened to -- he sent phone numbers that he had gotten the phone numbers of all of my sister-in-law, my mother-in-law, he was going to call everyone and tell everyone what had happened.

At that point I was scared. I did hang out with [defendant] thinking like I just need him to calm down.

. . . .

3

So I did that to avoid being blackmailed by him further. Again, I said to him, "I cannot stay with you, or, I can[not] be with you. I[ am] afraid of you."

So, again, I tried to end the relationship. It was just online bullying, non-stop robo-calling. He was still following me. He admitted he came to my children's school and was parking there, I guess, to intimidate me so that I would see his truck.

I do[ not] feel safe when . . . sitting in the front window of my house . . . I do[ not] let my kids sit here because, again, I also submitted evidence that [defendant] had texted and emailed me that he has weapons and used them. The police said he does not have -- he does[ not], so I[ am] not really sure.

Plaintiff also addressed an incident when defendant attempted to contact her husband. Plaintiff testified defendant was looking at her husband's Linked In profile. Additionally, defendant had a friend send plaintiff's sister-in-law a text message to inquire about plaintiff's husband painting a hockey rink that defendant managed. Plaintiff stated, "I am not aware of [defendant] representing or selling a hockey rink, so I think he was trying to lure my husband to hurt -- physically harm my husband. [Defendant is] a huge body-builder on steroids and just not the same person that I knew at all." Plaintiff testified she stopped attending her gym and begged defendant to leave her alone. At that time, plaintiff's biggest fear was her husband learning about the affair, but even after her husband learned of the affair, she stated she was "still terrified" of defendant.

4

Plaintiff testified she eventually blocked defendant from contacting her on her phone. Plaintiff expressed how she was fearful for herself and her children. She stated:

> He[ has] admitted stalking me. He[ has] come to four AA meetings. He parks by my children's school, which I find very intimidating. He keeps making these Facebook accounts to harass me. I do[ not] have social media because of him.
>
> I just want to be left alone. I[ am] in fear and in fear for my children. And I feel awful. . . . [Defendant] was not like this when I met him. I do[ not] know if it[ is] the steroids. But I feel terrible that I brought this around my family because now I do[ not] feel that my children are safe.
>
> . . . .
>
> I[ am] having panic attacks. Like, I can[not] sleep, I can[not] eat. I just want to be -- all I want is to be left alone. And I[ have] been begging him for months to leave me alone.

Defendant contended plaintiff was in an abusive relationship with her husband, and defendant was upset she resorted to substance abuse. He acknowledged he became upset when they were supposed to meet and she cancelled. Specifically, he testified, "I was hurt and I was mad and one night I did, you know, sa[y] hurtful things. I said, "[k]ill yourself, fuck you," you know,

A-2148-21

all these different things that were outlined in the complaint."[3]  Defendant admitted sending other text messages including, "[s]nitches get their guts stitches."  He also conceded being responsible for messaging one of plaintiff's friends on Facebook stating, "[a] friendly heads-up, [plaintiff] has this thing [for] married men at the gym.  She spends a lot of time talking to your husbands, so be careful."  He also texted plaintiff's sister-in-law from a fake Facebook account and sent plaintiff's friends messages about how plaintiff likes married men.

When asked about the hockey rink painting incident, defendant stated that he is coaching a local hockey team and explained:

> I reached out to a real estate friend -- and I know [plaintiff's] husband is a painter, I[ am] not going to ask him -- but as I[ am] trying to get quotes on what it would cost to get -- you know -- to paint a facility I asked around.  And I never said, hey, I want to meet this guy, I need to meet him in person, I have an inclination that I want to see him.  It was a general question.

---

[3] Other texts referenced in plaintiff's complaint from defendant in October 2021, included:  "There is nothing peaceful with me.  I burn every bridge so there is no [possibility] of it ever getting better"; "You are going to see how much I hate your guts now.  I threatened [you] so [you] know I am serious about what I am saying.  If you piss me off, for any reason, I fuck everything up."  When plaintiff responded, "[w]hy don't you leave [me] alone[,]" defendant responded, "I will when you kill yourself.  I hope you die today.  I fucking hate you[.] . . .  You fuck me over, you are dead."

6

In response, the judge questioned, "[would you not] go to every other painter in the state before you would go to him?" to which defendant responded, "true. Fair enough. Fair enough."

Plaintiff testified she was intimidated by defendant showing up at her children's school and AA meetings. She testified defendant admitted to being close to her children's school and parking nearby. She believed defendant did this to intimidate her. Defendant contends his barber is close to the children's school. Defendant admitted he told plaintiff that he parked on the street near the school. Moreover, in the exhibits he entered into evidence regarding his appearing near plaintiff's children's school, he indicated, "I hoped she would see my truck, but I NEVER have talked to her with her kids." Defendant also admitted showing up at plaintiff's AA meetings on three occasions—not four.

The parties entered their exhibits into evidence, and neither party called any witnesses to testify on their behalf. The trial court then rendered an oral decision. It noted defendant acknowledged he committed various acts alleged by plaintiff. The court found plaintiff more credible than defendant, and defendant's "stories do[ not] quite add up as much." In considering the testimony and history of domestic violence, the court determined plaintiff met her burden as to the predicate act of harassment. The court did not find harassment based

A-2148-21

on the text exchanges from October 2021, but found defendant's other acts—showing up at plaintiff's children's school, appearing at plaintiff's AA meetings, making reference to a gun, and the hockey rink issue—"far more concerning."[4]

The judge specifically determined defendant's testimony that he happened to be getting a haircut near plaintiff's children's school when she was present picking them up was not credible. Specifically, the court observed:

> getting the haircut . . . right by the school, where you parked, the timing of your haircut. Because you have a full complete understanding of her and her children's schedule and where. . . . [It is] interesting that that[ is] where you were and when you were . . . . [I]t does[ not] quite pass the smell test.

The court also expressed concern regarding defendant showing up at plaintiff's AA meetings. The court further noted plaintiff did "a lot of things [he had] no justification to do" including making reference to a firearm even if the police later determined he had no gun. It created a "chilling effect" and caused plaintiff to be in fear.

As to the hockey rink incident, the court concluded:

> There are areas . . . that make me very concerned. . . . That[ is] concerning. I would[ have] called the police. I do[ not] buy his answer. I think it[ is]

---

[4] The court also did not find plaintiff proved her allegations that defendant posted that plaintiff used illegal drugs, was an alcoholic, and did not properly care for her children on the website, "TheDirty.com."

> ridiculous. And I think he[ is]-- that is probably one of
> the most bothersome things to me in this case. It[ is]
> bizarre. You just had a five year affair with this woman
> . . . I think you find opportunities.

The court further commented:

> It[ is] just . . . chilling. . . . I think it[ is] highly
> suspicious and frightening. And it[ is] kinds of things,
> the little communications that cause fear. And I do
> think it[ is] inappropriate.

The court also noted defendant did things purposefully and intentionally knowing it would upset plaintiff and would cause her to be in fear with "any lawful purpose." The court ultimately determined defendant committed harassment under N.J.S.A. 2C:33-4(a) and (c).

The court next determined there was a need for an FRO for plaintiff's protection. It found plaintiff was credible and that defendant's harassment caused her to be fearful. The court noted, "I know you [are] in fear. . . . I[ have] heard it. You said you[ have] spent months trying to say, let[ us] stop." "But she[ is] fearful. And I watch a lot of people in my courtroom and I see a lot of things. I am one hundred percent satisfied that [plaintiff is] fearful." The court ultimately entered an FRO prohibiting defendant from having any contact with plaintiff, her husband, or her children.

II.

Defendant argues the trial court deprived plaintiff of a full and fair hearing in violation of his due process rights. Defendant further contends the court erred in allowing plaintiff to testify as to a predicate act not alleged in plaintiff's complaint. Defendant next asserts the trial court failed to address N.J.S.A. 2C:25-29(a)(1) to -29(a)(6) after concluding plaintiff committed an act of harassment. Defendant further asserts the court erred in failing to consider all of the "adequate, substantial, credible evidence" in finding defendant committed the predicate act of harassment.

Our scope of review is limited when considering an FRO issued by the Family Part. See D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013). That is because "we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." Ibid. "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). Deference is particularly appropriate where the evidence is largely testimonial and hinges upon a court's ability to make assessments of credibility. Id. at 412. We review de novo the court's conclusions of law. S.D. v. M.J.R., 415 N.J. Super. 417, 430 (App. Div. 2010).

10

The entry of an FRO requires the trial court to make certain findings, pursuant to a two-step analysis. See Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). Initially, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. The trial court should make this determination "in light of the previous history of violence between the parties." Ibid. (quoting Cesare, 154 N.J. at 402). Secondly, the court must determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6),[5] to protect the victim from an immediate danger or to prevent further abuse." Id. at 127 (citing N.J.S.A. 2C:25-29(b) (stating, "[i]n proceedings in

_____

5 The six factors are:

> (1) [t]he previous history of domestic violence between the plaintiff and defendant, including threats, harassment, and physical abuse; (2) [t]he existence of immediate danger to person or property; (3) [t]he financial circumstances of the plaintiff and defendant; (4) [t]he best interests of the victim and any child; (5) [i]n determining custody and parenting time the protection of the victim's safety; and (6) [t]he existence of a verifiable order of protection from another jurisdiction.
>
> [N.J.S.A. 2C:25-29(a)(1)-(a)(6).]

which complaints for restraining orders have been filed, the court shall grant any relief necessary to prevent further abuse")); see also J.D. v. M.D.F., 207 N.J. 458, 476 (2011).

Initially, we note defendant did not raise any of the above arguments before the trial court. He, therefore, urges us to view the purported errors under the plain error standard. R. 2:10-2. "Under that standard, we disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting R. 2:10-2). Reversal is warranted only where an error raises "reasonable doubt . . . as to whether the error led the [fact finder] to a result it otherwise might not have reached." Ibid. (first alteration in original) (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)).

A.

Defendant relies on Peterson v. Peterson, 374 N.J. Super. 116, 124 (App. Div. 2005), for the proposition that due process requires litigants be entitled to cross-examine witnesses and present their own witnesses.

The Fourteenth Amendment of the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. "[A]lthough 'Article I, paragraph

12

1 of the New Jersey Constitution does not [specifically] enumerate the right to due process, [it] protects against injustice and, to that extent, protects 'values like those encompassed by the principle[s] of due process.'" <u>H.E.S. v. J.C.S.</u>, 175 N.J. 309, 321 (2003) (alterations in original) (quoting <u>Doe v. Poritz</u>, 142 N.J. 1, 99 (1995)).

At the beginning of the trial, the judge explained how the hearing would be conducted:

> So I[ am] go[ing to] start again, [plaintiff], with you. I[ am] going to take your testimony.
>
> Then I[ will] go to you, Sir.
>
> I[ will] be more than happy to have either of you cross-examine. . . . [Y]ou have a constitutional right to do that. But when there[ are] no lawyers present the questions get directed to me and asked to present them. And if they[ are] appropriate and on point I will ask them.

The court further asked if either party wished to call any witnesses. They both declined. Accordingly, we are unpersuaded the court limited cross-examination or defendant's right to call witnesses.

This case is far afield from <u>Peterson</u>, where we noted the hearing was informal and neither party had the opportunity to conduct cross-examination. 374 N.J. Super. at 118. In addition, the defendant there had witnesses who did

13

not testify, despite the fact they were present at the hearing.  Ibid.  We were concerned due to the "informality of the proceedings and the failure to afford [the] defendant essential procedural safeguards including the right to cross-examine adverse witnesses and the right to call witnesses in his own defense." Id. at 124.  Here, at no point during the trial did the trial judge fail to afford the parties their right to cross-examination or to call witnesses.

Defendant next contends the court improperly reviewed the documents submitted by the parties prior to trial and argues the court had a pre-conceived notion regarding how the case should be decided.  In addition, defendant asserts the court "summarily" asked if the parties had any objection to moving their respective exhibits into evidence.

Although the court noted it reviewed the exhibits over lunch prior to trial, the court clearly explained that it would not "consider" any documents until they were entered into evidence.  Moreover, the court gave both parties the opportunity to introduce evidence and object to any evidence offered by the other party.  The court explained:

> So . . . first let me just ask both of you.
>
> Both of you have submitted all your different documents . . . , is it fair to say I should put that all in evidence with no objection?

14

Is that what you want . . . ?

THE PLAINTIFF: I[ am] not really sure I understand the question. I'm sorry.

THE COURT: See, you guys have submitted evidence, the texts –

THE PLAINTIFF: Yes.

THE COURT: -- the different things. They[ are] just here. There[ is] a procedure in the courtroom that if I[ am] going to consider it as -- you know -- as what it is, we[ are] putting it into evidence cause it means –

THE PLAINTIFF: Okay.

THE COURT: -- it[ is] part of the case.

So do you want –

THE PLAINTIFF: Yes.

THE COURT: -- everything as part of the case?

THE PLAINTIFF: Yes, please.

THE COURT: And, [defendant], do you, as well?

THE DEFENDANT: Yes.

THE COURT: Okay.

THE DEFENDANT: Yes.

THE COURT: So everything that you both have submitted is in evidence. Okay.

15

The court is the gatekeeper for the admission of evidence. That the court reviewed the exhibits submitted immediately before a virtual trial between pro se parties was not an error. The court would have had to review the evidence during the trial, in any event, and make a decision as to whether the evidence was admissible. "A judge sitting as the factfinder is certainly capable of sorting through admissible and inadmissible evidence without resultant detriment to the decision-making process . . . ." State v. Kern, 325 N.J. Super. 435, 444 (App. Div. 1999). Trained judges have the ability "to exclude from their consideration irrelevant or improper evidence and materials which have come to their attention . . . ." State v. Kunz, 55 N.J. 128, 145 (1969). Moreover, defendant fails to identify any evidence the court should not have admitted into evidence or any improper evidence the court relied upon in rendering its decision.[6] Accordingly, we are unconvinced defendant was deprived of due process in this matter.

_____

[6] Defendant raises an issue in his reply brief for the first time regarding a letter that may have been sent by plaintiff to the court. Defendant is not sure whether the letter was entered into evidence. We decline to consider the issue. "To raise [an] issue initially in a reply brief is improper." State v. Lenihan, 219 N.J. 251, 265 (2014) (alteration in original) (quoting Twp. of Warren v. Suffness, 225 N.J. Super. 399, 412 (App. Div. 1988)). Defendant's failure to raise this issue earlier "denied [plaintiff] the opportunity to confront the claim head-on; it denied the trial court the opportunity to evaluate the claim in an informed and deliberate manner; and it denied any reviewing court the benefit of a robust record within which the claim could be considered." State v. Robinson, 200 N.J. 1, 21 (2009).

A-2148-21

Defendant next argues the trial court allowed plaintiff to testify regarding the hockey rink painting allegation which was not within "the four corners of the complaint" and was prejudicial in nature. Defendant contends he was not given the benefit of sufficient notice and opportunity to properly respond.

Plaintiff counters her complaint clearly notes that "[w]hen [plaintiff] refused to go out with [defendant], [defendant] threatened to tell her husband about the affair." While the hockey rink allegation is not specifically referenced in the complaint, plaintiff argues defendant was aware plaintiff was alleging he had indicated that he would contact her husband about their affair.

Defendant did not deny attempting to contact plaintiff's husband through an intermediary to purportedly get an estimate for painting a hockey rink. When the court questioned defendant about why he sought an estimate from plaintiff's husband—as opposed to countless other painting contractors in the state—defendant answered, "[f]air enough." His response appeared to recognize the

_____

Under these circumstances, we should not consider this argument not raised before the trial court and raised for the first time in a reply brief. See Bd. of Educ. of Clifton v. Zoning Bd. of Adjustment of Clifton, 409 N.J. Super. 389, 443 (App. Div. 2009) (noting arguments raised for the first time in a reply brief on appeal need not be considered).

weakness of his position that he was just harmlessly trying to get an estimate. Defendant did not cross-examine plaintiff regarding her testimony on this issue, did not object to the question, or request an adjournment to properly respond.

Plaintiffs "often file complaints that reveal limited information about the prior history between the parties, only to expand upon that history of prior disputes when appearing in open court." J.D., 207 N.J. at 479. Frequently, "the trial court will attempt to elicit a fuller picture of the circumstances either to comply with the statutory command to consider the previous history . . . of domestic violence between the parties . . . or to be certain of the relevant facts that may give content to otherwise ambiguous communications or behavior . . . ." Ibid. The court further noted, "[t]o be sure, some defendants will know full well the history that plaintiff recites and some parties will be well-prepared regardless of whether the testimony technically expands upon the allegations of the complaint." Id. at 480. In situations where the parties are not prepared to address the allegation, the court must ensure the defendant is afforded an adequate opportunity to be apprised of the allegations and respond. See H.E.S., 175 N.J. at 324.

We agree a party should not be blindsided by a new allegation, but that is not what occurred here. Defendant did not object and readily responded to the

allegation. Moreover, he did not suggest defendant's testimony was an unfair surprise or that he needed an adjournment. Rather, this was one of a series of related incidents, and defendant was aware from the complaint about plaintiff's allegation he had threatened to contact plaintiff's husband. Accordingly, we find the court did not err in considering the testimony.

Moreover, even if the court did err in allowing the testimony, it was not clearly capable of producing an unjust result. R. 2:10-2. This was just one of several incidents—defendant showing up at plaintiff's children's school, plaintiff's AA meetings, and making reference to a gun—that concerned the court. Although the court was concerned with the allegation, it was only "one of the bothersome" issues in the case. In short, there was other substantial testimony and evidence regarding defendant's conduct the court found credible, and we conclude there is not a reasonable doubt that the purported error caused the court to reach a result it otherwise may not have reached. See Jenkins, 178 N.J. at 361.

## C.

Defendant contends the trial court failed to address N.J.S.A. 2C:25-29(a)(1) to -29(a)(6) in connection with his application for an FRO after it found plaintiff committed an act of harassment.

19

Defendant never appealed from the order denying his request for an FRO. Neither his notice of appeal nor his case information statement in this appeal identified that order as being challenged. Under these circumstances, we will not consider defendant's challenge to the denial of his FRO in this appeal. See Campagna ex rel. Greco v. Am. Cyanamid Co., 337 N.J. Super. 530, 550 (App. Div. 2001) (refusing to consider an order that was not listed in the plaintiffs' notice of appeal); Sikes v. Twp. of Rockaway, 269 N.J. Super. 463, 465-66 (App. Div.) (explaining that an issue was not properly before this court since plaintiff did not raise the issue in his notice of appeal and he failed to file a relevant trial transcript with his appeal), aff'd o.b., 138 N.J. 41 (1994); see also Nieder v. Royal Indem. Ins., 62 N.J. 229, 234 (1973).[7]

---

[7] Even if we were to consider defendant's argument on this issue, it is unpersuasive. In Silver, the court explained that "when determining whether a restraining order should be issued . . . the court must consider the evidence in light of whether there is a previous history of domestic violence, and whether there exists an immediate danger to a person or property." Silver, 387 N.J. Super at 126. We note that while the court did not specifically reference the statute, the court clearly addressed the issue of defendant's safety. The court noted, "[y]our [defendant's] argument with regard to her conduct of why you think you need to be safe from her, I do[ not] think you do. I think you[ are] fine. I think she wants to move on and I do[ not] see her coming back to you in any way, because I[ am] satisfied with the consistency and with her testimony, and, even with everything I looked at in evidence." Moreover, the trial judge reasoned that plaintiff's conduct "was in sort of a defensive mode -- and, again, I[ am] not

D.

Defendant argues he was forced to defend himself throughout the entirety of the proceeding, the evidence he attempted to submit was largely ignored and disregarded, and his TRO was ignored. Defendant further asserts that the trial judge made its decision based upon insufficient facts. Defendant additionally contends he was prejudiced because the trial court stated when it started the trial it had only reviewed "most" of the evidence and therefore "it must be concluded that the [c]ourt failed to consider all of the adequate, substantial and credible evidence" in finding defendant committed a predicate act of harassment.

We recognize the expertise of Family Part judges, many of whom routinely preside over many domestic violence cases. Cesare, 154 N.J. at 413. It is necessary that ". . . appellate courts [ ] accord deference to family court factfinding." Ibid. In such matters, we will not disturb the "factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." S.D., 415 N.J. Super. at 429 (quoting Cesare, 154 N.J. at 411-412).

---

saying her conduct was perfect but I do[ not] find that you have a need to worry in the future. Because that[ is] my last test [under Silver] I have to do here."

Defendant fails to point to any specific evidence the court failed to consider or how that evidence would have impacted the ultimate outcome of this case. Even though the court reviewed the documents submitted by the parties before trial, the court noted that it would not formally consider the exhibits until they were actually admitted into evidence. The court later admitted all of defendant's exhibits into evidence, and there is no indication the court disregarded any evidence. Rather, the court found certain testimony and evidence presented by plaintiff to be more credible. Moreover, defendant admitted to many of the allegations made by plaintiff, including texting plaintiff in an offensive manner, contacting her husband, being nearby the area of her children's school, and going to her AA meetings on multiple occasions.

Defendant points to certain evidence that contradicts plaintiff's allegations. That is often the case in contentious litigation. However, as discussed above, the court made specific findings of facts and conclusions of law after considering the conflicting testimony and evidence and based its decision on competent, relevant, and reasonably credible evidence. We discern no basis to disturb those findings and affirm substantially for the reasons set forth in the court's oral decision.

22

To the extent we have not addressed the parties' remaining arguments, we are satisfied they are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2148-21